147 So. 641

## GRAVETTE v. STATE.

### 7 Div. 874.

Court of Appeals of Alabama.
June 21, 1932.

Rehearing Denied Feb. 21, 1933.

J. J. Cockrell, of Talladega, for appellant.

Thos. E. Knight, Jr., Atty. Gen., for the State.

Brief did not reach the Reporter.

BRICKEN, P. J.

The purported exceptions to the oral charge of the court are not presented for review. They appear in the record proper only and not in the bill of exceptions; they are, therefore, abortive.

This appellant demanded, and was granted, a severance. He was jointly indicted with two others—Floyd Molliston and Carroll, alias Red, Hudgins—with the offense of burglary and upon his trial in the court below was convicted as charged; the court sentenced him to an indeterminate term of imprisonment in the penitentiary of not less than five nor more than six years. The building alleged to have been burglarized was the store of one C. C. Hall, and the evidence without conflict established the corpus delicti, it having been shown affirmatively that large quantities of goods, merchandise, and groceries were stolen from the store at the time of the breaking into and entering. And it was shown by the defendant's counsel on cross-examination of C. C. Hall that on the preliminary hearing he (Hall) had testified that he had recovered about $200 worth of merchandise which had been stolen at the time of the burglary and which he identified as a part of his stock. At the conclusion of the state's case, the defendant moved the court to exclude the evidence from the consideration of the jury on the grounds that the state had in no way connected the defendant with the alleged crime. This motion was overruled, and this action of the court is the principal insistence of error upon this appeal, although numerous other points of decision are presented and relied upon for a reversal. We are of the opinion the court was not in error on this ruling. As to the perpetrator, or perpetrators, of the admitted crime, the evidence was circumstantial, and we think the court properly held that innumerable facts and circumstances in evidence, incriminating in their nature, rendered the court without authority to hold, as a matter of law, that the accused was entitled to the af-

firmative charge. The long-settled rule upon this question is restated in the case of Ode Grimes v. State, 24 Ala. App. 378, 135 So. 652, 653, and numerous authorities therein cited. In that case it is said: "The law is to the effect that the general charge should never be given when there is any evidence, however weak and inconclusive it may be, tending to make a case against the party who asks it." This principle of law in no manner affects, or militates against, the measure of proof necessary to a conviction, which is so well settled. It certainly cannot be said in this case there was no evidence tending to connect this appellant with the commission of the crime. It is admitted that he and the two other men indicted with him were together during the afternoon and evening of the night the burglary was committed. The burglary took place about 10:30 o'clock that night. They were seen together, and it was admitted they were together in an automobile of the description of the car that was chased by the injured party from near his store, and large quantities of the stolen goods were thrown along the road from the fugitive car when closely pressed and followed by Hall. It is undisputed that the three indicted men visited the Hall store, some eighteen miles from their home, in Talladega, in the afternoon before the crime was committed that night, and Mrs. C. C. Hall, wife of the alleged injured party, who was in the store at the time, testified and said: "My name is Mrs. C. C. Hall, I help my husband in the store out at Eureka. I work in the store with him. On the date our store was broken into I had been keeping store that afternoon. This defendant, Jess Gravette, in company with Mr. Molliston, and Mr. Hudgins, came to our store between four and five o'clock; close to dusk. They drove up there in a car—a Dodge Coupe; an old model-like car; an old model Dodge Coupe. They stayed in the store about ten or fifteen minutes; all three came in the store. I sold them some drinks and some candy. While they were in the store Mr. Molliston, Mr. Gravette (deft.) and Mr. Hudgins all looked at the windows, and looked at the stove that was in there, and they kept noticing and watching about where everything was placed. After I noticed them looking around there I took down the number of their car while they were leaving. The store was broken into between ten and ten-thirty at night, while I was at a party between a mile and a half and two miles away from my house." Floyd Molliston, one of the indicted men, testified as a witness for the defendant and stated all three of these accused men went to the store in question during the afternoon of the date of burglary, that they went in an old model Dodge coupé which belonged to Jess Gravette, and that a pistol also belonging to appellant was in the car. He did not, however, deny the testimony of Mrs. Hall as to the examination of the store, windows, stove,

goods, etc. Hudgins, the other accused man, testified likewise and he did not deny the testimony of Mrs. Hall as to their looking around the store at the windows, goods, etc. Mrs. Hall's testimony on this point was not denied. Evidence of this conduct upon the part of the accused men was relevant and was properly submitted to the jury, together with all the evidence, for its consideration in determining the one main question of fact involved in this case.

The alleged injured party, Hall, testified that upon returning from the party about 10 or 10:30 that night he discovered his store had been broken into and entered, and stated: "When we drove up, the front door of the store was open and the car light was shining on some tomato cans and I jumped out of the car and went in there and saw nearly everything was gone out. The hinges were taken off of the door and that was the way they got in, and I went into the store and found a lot of stuff all missing, such as tobacco and snuff and overalls and coffee and sugar and eggs. There was about 40 dozen eggs—a soda box plum full, gone. I jumped in a car and ran up the road a little piece, about a mile, and we overtook a car. Before that, we heard a fuss like a car lid shut down and a fuss like a car starting up. Then was when we started up the road, immediately after we heard that fuss. We heard this fuss right up the hill towards Talladega. We got in about 30 or 40 yards of the car. When I got so close up to them, they commenced shooting a pistol on each side, one on the right and one on the left, and I slowed up. I was in a 1929 model A Ford, a truck, a pick-up truck. They were in a Dodge coupe old model closed car. We ran them clean on into Talladega to right out here at Mr. Beaver's place, right here in Talladega. We lost them on account of so much dust. I could see where the car skidded in the dust there and turned off. The last time I saw them was at the Beaver's place out here from town. While I was chasing that car into Talladega, I saw them throw croker sacks out of the car. The first load of stuff was thrown out about Ragland Mountain, before they got into the pike, about 300 yards before they came into the big road. They threw this stuff out on the left side; that was the driver's side. Most of it was thrown out on that side and was scattered out in the road and just went every which way all over the road, and some stayed in the sacks, but I did not stop then. They did not throw out anything else after they hit the pike coming into Talladega. They threw out stuff all along about fifty yards apart. I think it was three croker sacks full of stuff. I lost them out there near the Beaver's place near Talladega. I came on into Talladega then." He also stated: "I reported the burglary to the police in Talladega."

The record shows that several officers, including the sheriff, made immediate and active investigation and searched for the parties who had been chased into town by Hall from near his store. Police Officer Dickie testified, among other things: "I was on Police force here in Talladega in February of this year, and on the night shift. I remember on February 5th, Mr. C. C. Hall reported that his store had been broken into, and he made this report right close to 12:00 o'clock. I was in the Dixie Cafe here in Talladega, and had just finished eating my lunch. Mr. Churchill another night policeman, was with me at the time. After Mr. Hall reported this to me, I sent Mr. Churchill to Broom Street to look for the car that was described, and I stayed in the cafe and called the Sheriff and his deputies." The officers, who testified in this case, were in accord in their testimony. They gave a minute description of their actions and efforts in trying to locate the car in question and the three men who were in the car as reported by Hall. In substance the testimony of these officers tended to show that they knew the old model Dodge coupé; that it belonged to Jess Gravette, this appellant; that they found this car in the back yard of appellant's father. And in this connection Police Officer Dickie testified: "I felt of the radiator, and also the casings, and you could not hold your hand on the radiator because it was so hot, and the casings were still warm. I put my hand on all four casings, and also examined the inside of the car. I found a lot of broken eggs on the front of the car, and all over the running board. And Mr. Williams found a can of salmon landed on the back bumper or spring. We went into the old man Gravette's house and looked for Jess, appellant, and did not find him there. Then we rode until we found where Floyd Molliston lived and we found Jess Gravette in his house. Molliston was there, too. We found a 38 Smith & Wesson pistol on the mantel. It had a pearl handle. I did not take it in my hands, but I saw the Sheriff and others do that. Mr. Churchill, Mr. Williams, the Sheriff and Spencer were with me when I went to Molliston's house. We found some empty cartridges about there; some one picked them up off of the floor." In answer to the question, "Did you all examine the clothes of these parties?" he answered, "We did, Hudgins." "Mr. Williams picked up a pair of khaki pants that he had thrown behind the trunk and they had eggs broke all over them in front and in the cuffs of the pants were some broken shells. After we put him in jail we went and tracked the car over there from Beavers on the Lincoln road to where we found it right on to old man Gravette's home. Where the car left the road at Beavers' it slided down to where it turned on West Street." Sheriff Burk testified: That the old model Dodge coupe belonged to this appellant. That "that night down at old man Gravette's I examined that car. I put my hand on the radiator, it was hot, warm." He testified that he started tracking the car out here at Mr. Beavers' on the road leading from Lincoln and tracked it to Mr. Gravette's house on Coosa street, and found the car around at the back of the house. In answer to the question, "Just describe what condition you found the pike in out there where that road leaves it in front of Mr. Beavers?" he stated: "That was where a car slid around. It was a frosty night and we tracked it up to Coosa Street where we found another skidded place, and then tracked it to Mr. Gravette's house and that is where we found it. The ground was frosty that night. The tracks were plain in the street there, leading right up to Mr. Gravette's house. He found Jess Gravette up at his brother-in-law's house, Floyd Molliston. In the house where I found Jess Gravette I also found a 38 pistol—pearl handle. It was lying on the mantel. There were cartridges around there." He testified that he examined the pistol. The witness stated that he had had considerable experience with firearms. He had been sheriff of Talladega four years preceding this present term and had occasions to handle firearms during that time and had examined various and different kinds of firearms.

The foregoing was sufficient predicate for the witness to testify as an expert. He stated, from his experience in examining firearms, in his opinion that pistol had been recently fired. He further testified that he brought the pistol to town and put it in the vault, but later turned it back to this appellant, who claimed the pistol was his. He testified that broken eggs were all over Mr. Hudgins' trousers. Also, there were broken eggs in the car and on the foot and side of the car, and on the running board on the right-hand side of the car. He stated: "It looked like there had been several dozens of eggs smashed on the car, and in my presence there was found a box of salmon and cigarette papers; the box of salmon was lying on the back spring. I found a lot of light bulbs in the car."

This court is of the opinion that the foregoing, together with other evidence of like import, required the submission of this case to the jury. The insistence to the contrary is untenable and cannot be sustained.

The appellant through his witnesses, not having testified in his own behalf, offered testimony tending to explain the broken eggs in the car, and upon the trousers of Hudgins, also the can of salmon lodged on the spring or bumper. They insisted the car in question was not the one Hall chased from near his store to Talladega, a distance of about eighteen miles, and claimed the car found in old man Gravette's back yard by the officers had been left at that place about 8 that evening

and had only been driven a short distance by the young brother of the defendant to get some medicine for his sister, and that this took place about 10 that night; that is to say, some two and a half or three hours before the officers located and examined the car.

No explanation or denial seems to have been made as to the recent firing of the defendant's pistol which admittedly was in the old model coupe at the time the three accused men were seen in the car.

The conflicts in this testimony, upon practically every material point, presented the important and controlling question for the jury to determine; that question being whether the theory and testimony of the state was true, and sufficient to convince the jury of his guilt beyond all reasonable doubt and to a moral certainty, or whether the defendant's insistences and evidence in support thereof was sufficient to generate a reasonable doubt in the minds of the jury as to the guilt of the defendant.

As stated, this case is one dependent largely upon circumstantial evidence. It was well tried by both sides, and particularly so by the learned judge who presided. We will not discuss in detail the innumerable points of decision insisted upon by the able counsel for appellant. It would extend this opinion to too great length and could serve no good purpose. We have, however, as the law requires, examined and have carefully considered every point or insistence of error presented. We discover no reversible error in any ruling of the court to which exception was reserved. The one main inquiry in this case was whether this appellant was one of the men who committed the crime complained of. From all the evidence, and its tendencies, we cannot hold that injustice to appellant resulted from the final determination of this case in the court below. The jury, as stated, were the sole judges of the facts. It was their duty, in considering and weighing all the evidence, not only to follow the instructions of the court as to the law, but to bring into use their everyday common-sense and experience. This, we think it clearly appears, the jury has done. We are of the opinion that the evidence was ample to sustain them in the verdict rendered, and to support the judgment of conviction pronounced and entered.

Finding no error of a reversible nature, the judgment of conviction from which this appeal was taken will stand affirmed.

Affirmed.

### On Rehearing.

As a result of the manifestly sincere and earnest appeal of appellant's able counsel, this court, as a whole, on rehearing, has read again the entire evidence adduced upon the trial of this case in the court below; and, in addition, the whole court has read and considered the original brief of appellant, and also the brief filed upon rehearing. It is insisted by appellant's counsel that the conviction of this appellant was a great injustice, and we are urged to remedy this by holding the court below in error and reversing the judgment of conviction. This, of course, we cannot do unless reversible error appears in the ruling or rulings of the trial court. The jurisdiction of this court is appellate only in cases of this character, and review here, in such cases, is limited to those matters upon which action or ruling at nisi prius was invoked or had. We are without authority to substitute ourselves for the jury, who are the triers of fact; nor are we vested with pardoning powers. The original opinion in this case must be adhered to. We think under the conflicting evidence the case presented a jury question.

Application for rehearing is overruled.